**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

---

**Danielle Snow,**

Plaintiff,

--against--

**Janet Napolitano, as Secretary of the United States Department of Homeland Security,**

Defendant.

---

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ MAY 27 2010 ★
BROOKLYN OFFICE

Docket No. CV 10- 2396

**VERIFIED COMPLAINT and DEMAND FOR A JURY TRIAL**

COGAN, J.

**Preliminary Statement**

1. Plaintiff Danielle Snow ("Snow") brings this action against her former employer, Janet Napolitano ("Napolitano"), as Secretary of the United States Department of Homeland Security ("DHS"). Snow brings this action to redress her right to employment free of discrimination on the basis of her gender and to redress her right to complain of gender-based discrimination without suffering retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*

2. Snow was employed by the Transportation Security Agency ("TSA"), a unit of DHS. TSA discriminated against Snow on the basis of her gender and subjected her to working in a hostile work environment. TSA denied Snow the same terms and conditions of employment that it grants to its male employees. TSA has a pattern and practice of discriminating against its female employees. Snow complained to TSA of gender-based discrimination and sexual harassment and, in response, TSA terminated Snow in retaliation for complaining of discrimination.

**Parties**

3. Snow is a Black woman and a citizen of the United States. In March 2007, Snow was hired as a Transportation Security Officer in the TSA. She continued to work for the TSA until she was fired in July 2008.

4. Defendant Napolitano is sued in her official capacity as Secretary of DHS.

**Administrative Procedure**

5. On September 4, 2008, Snow timely contacted an EEO counselor at the TSA to complain of employment discrimination on the basis of her gender (female) and of reprisal for complaining of discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended. Snow timely filed a written complaint on the same bases with the TSA on November 3, 2008. The EEOC dismissed Snow's complaint on March 1, 2010, in a document entitled "Dismissal (Pursue Suit in Federal Court)." Snow received that dismissal on March 10, 2010. Less than 90 days have passed since Snow received the EEOC dismissal of her complaint; therefore, pursuant to 42 U.S.C. § 2000e-16(c), Snow may bring this action at this time.

**Venue**

6. Pursuant to Section 2000e-5(f)(3) of Title VII of the Civil Rights Act of 1964, as amended, venue properly lies in the Eastern District of New York ("District") as Snow would have worked in this District but for the TSA's discriminatory and retaliatory firing of her. In October 2009, Snow moved to the District to be near her family, and she continues to reside in the District at the present time. But for her firing by the TSA,

Snow would have been employed by the TSA at one of the airports located in the District.

**Statement of Facts**

7. Early in 2006, Snow made an on-line application for the position of Transportation Security Officer ("TSO") with the TSA. She took three written tests and was interviewed. Approximately one year later, in March 2007, Snow was appointed by the TSA to a TSO position at the Memphis International Airport. When she came to the job, Snow had a Bachelor's degree in Sociology from the University of Memphis. Snow was well qualified for the TSO position, as the position does not require any college education at all.

8. After she was hired, the TSA gave Snow training in the duties of the TSO position, including training in: (a) the screening of passengers through the use of the walk-through metal detectors, the full-body pat-down inspection, and the hand wand inspection; (b) the screening of luggage, through the use of the x-ray screening machine, the Explosive Trace Detection ("ETD") device, the CT-80 machine, and the various methods for physical search of luggage; and (c) the standard operating procedures.

9. After Snow completed the training, she was assigned to report to Katherine Young, whose title was Supervisory Transportation Security Officer ("STSO"). Snow reported to STSO Young from April 2007 to October 2007. Thereafter, Snow reported to STSO Archie King until she was terminated in July 2008.

**A. Snow Was Required to Work in a Sexually Hostile Work Environment Due to the Discriminatory Actions of Male Co-Workers**

10. During the period from April 2007 to October 2007, STSO Young was fair in assigning work; Snow did well in her job, and received a positive evaluation from STSO Young. However, Snow was subjected to working in a sexually hostile work

environment created by the actions of her male co-workers, an environment which would be offensive to any reasonable woman.

11. As a routine and daily matter, Snow's male co-workers made harassing, sexist and inappropriate remarks to each other about Snow, about her female co-workers, and about female passengers, commenting on their bodies, clothing, and other personal characteristics. The men would intersperse their comments with swear words, saying "fuck" and "bitch," and they would smirk and laugh. When they singled out a woman passenger for their offensive appraisals and comments, they would speak more quietly but they would still laugh; and the men would make sure that their harassing comments—whether about female TSOs or female passengers—were audible to Snow and her women co-workers.

12. One type of sexual harassment that Snow endured many times occurred when a passenger was traveling with a vibrator. Much to Snow's mortification, in such situations, Snow's male co-workers would call Snow over to the x-ray screen, ask her to look at the vibrator on the screen and, under the juvenile pretense that they needed her advice, would ask her whether the vibrator was an explosive device. Snow was forced to endure this humiliation to hoots of laughter from the men. (For a trained screener, it is virtually impossible on an x-ray screen to confuse a vibrator with an explosive device.)

**B. Snow Changed Shifts but the Sexual Harassment Continued in the Presence of Her Managers and by Her Immediate Supervisor**

13. In October 2007, after Snow bid for a new shift, she was assigned to report to STSO Archie King, a white male. Snow's immediate supervisor was Walter Rodgers, a Black male, who held the title of Lead Security Transportation Officer ("LTSO"). LTSO Rodgers reported to STSO King, who reported, in turn, to Isaac Curry, the Screening Manager ("SM").

14. When Snow began reporting to STSO King, Snow was subjected to repeated and pervasive sexual harassment, which would be offensive to any reasonable woman. This time, however, the harassment was not confined to the actions of her male co-workers, but included discriminatory activities by her immediate male supervisor as well.

15. When Snow began reporting to STSO King, her male co-workers and her male supervisors made inappropriate remarks about Snow herself, about her female co-workers, and about female passengers in Snow's hearing. For example, the men would say, within Snow's hearing, that Snow was "top heavy" or they would comment about the "booty"[1] or other body parts of Snow's female co-workers. Snow's male workers also "consulted" her about the images of vibrators shown on the luggage x-rays. Although this conduct often took place in the presence of LTSO Rodgers and STSO King, Snow's supervisors did not take any steps to stop the conduct. In fact, LTSO Rodgers himself made many of the "top heavy" comments about Snow.

16. After Snow began reporting to STSO King, the sexual harassment intensified to include a physical component. In particular, one of Snow's co-workers, Michael Smith ("TSO Smith"), during his breaks, would routinely come and stand so close to Snow, as she was working, that his body would be touching hers. TSO Smith would slide his leg to rest along Snow's leg, or his chest would be on her arm, or he would put his arm around her back, with his hand close to her breast. Once or twice each day, usually when Snow was operating the x-ray machine and unable to move away, TSO Smith would come and stand so close to Snow that he would be touching her. Snow would ask him to go away, but he would refuse.

---

[1] "Booty" is a slang term referring to a woman's buttocks.

17. Snow observed that TSO Smith also sexually harassed other women, frequently hugging her female co-workers, or touching them in other ways. This conduct was clearly unwelcome to the women, as it was to Snow, and its sexually harassing nature was evident to Snow's supervisors.

**C. Snow Was Denied the Same Terms and Conditions of Employment Accorded to Men, Who Were Given Preferences in Assignments, in Supervision, and in Training**

18. In addition to the sexual harassment described above, Snow was denied the same terms and conditions of employment as those granted to men. Men were given preferential treatment, including easier duties, much more lenient supervision, and more training.

19. ***Discrimination in Assigned Duties.*** Snow's team was directly managed by LTSO Rodgers, and consisted of LTSO Rodgers and eight TSOs, half of whom were female. LTSO Rodgers routinely assigned Snow and the three other women TSOs to the most difficult work assignments, while men received easy work assignments. Generally, the women TSOs did the most physically taxing work, such as loading the luggage onto the conveyor belts, while the male TSOs on the team were allowed to leave the work area to watch TV in the passenger waiting areas. Similarly, when the team was working in the international arrivals area, the women loaded and inspected luggage while the men merely directed traffic.

20. LTSO Rodgers' team was frequently assigned to work in the B Check Point, which is the largest and busiest Check Point in the Memphis airport, staffed by as many as five teams at once. Snow and the other women on her team worked very hard when they were assigned to the B Check Point, but the men in her team generally were not assigned to this difficult Check Point. Instead, the men were frequently assigned to the A

Check Point or the C Check Point, which were much less demanding work assignments. In fact, men were frequently assigned to the A and C Check Points at night when those work stations were actually closed, while women were assigned to the busy B Check Point, which continued screening passengers at night. While Snow and the other women were working hard at the B Check Point, the men were assigned to the easy task of just sitting at the closed A and C Check Points to make sure that no passenger would sneak through them.

21. An example of preferential treatment occurred in April or May 2008, when Snow was working the busy B Check Point with another team member, TSO Patrick Worship. TSO Worship was forcing Ms. Snow do all the work, while he—hands in pockets—chatted with a supervisor. Ms. Snow complained to LTSO Rodgers about this, to no effect. Frustrated, Snow complained to supervisor STSO King who put TSO Worship into another active work position. However, within 15 minutes, TSO Worship was again chatting with another supervisor, while taunting Ms. Snow to "mind [her] own business." TSO Worship was neither reprimanded for his behavior nor required to perform his duties.

22. ***Discrimination in Supervision***. The preferential treatment also included less strict supervision of the men. In fact, the supervision of men was so lax that while all the four women on the team worked hard, only two of the men on Snow's team worked with any consistency. Instead of being a problem, this was a source of amusement for the team supervisor. For example, STSO King made light of the fact that one of the male team members, TSO Michael King, routinely avoided his duties. TSO King's aversion to work was well known to management and his team members alike.

23. In contrast, Snow and the women in her team were subjected to much stricter supervision than the men. For example, whenever Snow or another female worker left the work area for valid reasons, STSO King would immediately start inquiring about their whereabouts, creating anxiety among female staffers about taking even a quick bathroom break. Men, however, were permitted to take long breaks without inquiry. TSO Smith often left his work area for long periods of time to watch football games on televisions located in passenger waiting areas, or to take the opportunity to fondle Snow—who *was* working.

24. ***Discrimination in Training.*** Much of the training that was available for TSO's was on-line training. The male TSO's who reported to STSO Rodgers had frequent opportunities to take advantage of the availability of the on-line training, including the occasions when the A or C Check Point to which they were assigned was closed. In contrast, the women TSO's who reported to STSO Rodgers had to continue their hard work at the active B Check Point or other venues, and could not avail themselves of the on-line training. Thus, STSO Rodgers' gender-based discriminatory assignment of duties to the TSO's who reported to him resulted in denying Snow access to the TSA's on-line training for TSO's.

**D. Snow and Other Women Complained of Sexual Harassment and Gender-Based Discrimination**

25. Snow and several of her woman co-workers repeatedly complained to their supervisors at five different levels of the TSA's hierarchy about the TSA's gender-based discrimination against them and about the sexually harassing hostile environment to which the TSA subjected them. None of the TSA's supervisors told Snow or her co-workers to speak to an EEO counselor. The TSA did not remedy the complained-of discrimination or the sexually harassing hostile work environment.

26. In April or May of 2008, Snow went to LTSO Rodgers and complained to him about TSO Smith's sexual harassment of her, described in paragraphs 13, 14 and 15, above. When LTSO Rodgers heard Snow's complaint about TSO Smith's sexual harassment of Snow *he laughed,* and then said that he would talk to TSO Smith. After Snow complained about TSO Smith to LTSO Rodgers, TSO Smith continued to sexually harass Snow—even in front of LTSO Rodgers.

27. Snow told STSO Young about the gender-based discrimination she was suffering in job assignments, supervision, and training under STSO King and LTSO Rodgers.

28. Snow also brought the gender discrimination at the TSA to the attention of Isaac Curry, a TSA screening manager. In January or February 2008, Snow, Monica Jackson, and another woman TSO complained verbally to Mr. Curry about the preferential treatment given to the men in their team. The women complained that male TSO's were given preferences in training, duties assigned, and supervision. Snow pointed out that only two of the five men in her team worked with any consistency, a fact well known to TSA management. On information and belief, Mr. Curry did not look into the matter. The gender discrimination continued after the women complained to Mr. Curry.

29. Snow also complained of gender discrimination to Marcus Pierce and Jim Cooksey, two TSA managers. Manager Pierce and Manager Cooksey attended a meeting with Snow and Monica Jackson to discuss the gender discrimination and retaliatory actions taken by the TSA. Both managers failed to respond to the gender discrimination complaints of Snow and Ms. Jackson. Manager Cooksey warned Snow that, despite the unfairness of the gender discrimination, Snow "should be walking on eggshells," and

"shouldn't challenge anything" or "draw attention" to herself while she was in her two-year probationary period.

30. Finally, as described below in paragraph 34, Snow also spoke to Mr. McCarthy, the Federal Security Director ("FSD") at the Memphis International Airport, about the unfairness of the two disciplinary notices she received in retaliation for complaining about discrimination and harassment.

**E. The TSA Retaliated Against Snow for Complaining of Discrimination**

31. After she complained about gender-based discrimination and sexual harassment at the TSA, Snow was subjected to retaliation on two occasions.

32. On July 3, 2008—about six weeks after she complained of discrimination—Snow received an "employee counseling notice" that was issued in retaliation for her earlier complaint of gender discrimination. Ostensibly, Snow received the notice in response to an incident that occurred on June 29, 2008, in which Snow was hit by a piece of luggage while using a CTX machine—a machine she had not been trained to operate. Although training regarding the CTX machine was available on-line, Snow, who was discriminatorily assigned to work more than male TSO's were, never had a chance to get the training. Other team members used a CTX machine in the same manner as Snow had without incident, but Snow was hit by a piece of luggage because the CTX machine was being operated too fast. As required, Snow filled-out an "on the job injury" report. In response, she received an "employee counseling notice" for carelessness on July 3, 2008. Notably, the man who had caused the accident by operating the CTX machine too fast was not disciplined. The employee counseling notice that Snow received was a pretextual form of retaliation, as other team members used a CTX machine in the same manner that Snow did, but no other team member was cited for carelessness. Indeed, on

information and belief, those TSO's who used the CSX machine in the same way that Snow did and were hit by flying luggage, as Snow was, did not receive counseling notices. Since Ms. Snow had never been trained on the use of the CTX machine, it seems clear that this "write-up" was issued in retaliation for her earlier complaints of gender discrimination.

33. The second instance of retaliatory discipline occurred nine days later, on July 12, 2008. On that day, Ms. Snow was assigned the "X-ray operator" position, a *required* position in the passenger screening process. While Snow was working in the x-ray position, LTSO Rodgers asked her to search a female passenger. Snow was willing to search the passenger, but—as is common practice—Snow suggested that the person working the *non-required* "loader" position do the search. "Loaders" are not required in the passenger screening process. In fact, employees are trained that "loaders" should provide assistance in such situations. Moreover, Snow and her TSO team members had specifically been trained that the "loader" is the preferred position to perform a search of a passenger. However, despite the long-standing practice of using "loaders" to search passengers—thus, allowing "X-ray operators" to continue with their required work—Snow was reprimanded and then terminated on July 23, 2008, for making this innocuous suggestion, which Ms. Snow had seen other TSA employees make in similar situations. Not only was Snow's suggestion in line with standard practice, she also did not say that she wasn't willing to perform the search. In light of these facts, it is clear that the reprimand and termination Ms. Snow received were in retaliation for her earlier complaints of gender discrimination.

34. Snow spoke about the unfairness of both disciplinary notices to Mr. McCarthy, the Federal Security Director ("FSD") at the Memphis International Airport.

First, in or around July 2008—soon after the first incident on June 29, 2008—a male TSO brought the unfairness of the CTX counseling notice Snow had received to the attention of FSD McCarthy at a town hall meeting. At that time, several of Snow's co-workers, in addition to the TSO who had raised the issue, also expressed their concerns to FSD McCarthy about this incident. A TSA training instructor at the meeting, Dr. Larry Edwards, took down Snow's name and the facts surrounding the June 29, 2008, incident and promised to investigate the matter and get back to Snow. Moreover, FSD McCarthy, personally, spoke with Snow, and promised action. However, Snow never heard from either FSD McCarthy or Dr. Edwards about the matter. Some time later, Snow spoke to FSD McCarthy about the second incident, which occurred on July 12, 2008. But, FSD McCarthy failed to follow-up on this incident, also.

35. Finally, J.T. Coggins, Assistant Federal Security Director, terminated Snow in retaliation for her complaints of gender discrimination in January or February 2008 and in April or May 2008, as described above.

**F. Another Woman Who Complained of Discrimination Was Also Fired**

36. Monica Jackson was one of the female employees who complained with Snow about gender discrimination in January or February 2008. She was also fired.

**G. Snow's Pain and Suffering**

37. Because the TSA discriminated against Snow on the basis of her gender, subjected her to working in a sexually hostile work environment, and retaliated against her for complaining about that harassment and discrimination, Snow has suffered in body and soul. Snow has suffered and continues to suffer from migraines, stomach aches, back and neck pain, depression, anxiety, insomnia, weight gain, and hair loss. Snow has had to consult a physician and has had to take prescription medications.

**First Cause of Action**

38. Plaintiff repeats and realleges the allegations of paragraphs 1-34, as if fully set forth herein.

39. Defendant violated Plaintiff's right to employment free of discrimination on the basis of gender as set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

**Second Cause of Action**

40. Plaintiff repeats and realleges the allegations of paragraphs 1-36 as if fully set forth herein.

41. Defendant violated Plaintiff's right to employment free of retaliation for complaining of discrimination on the basis of gender, as set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests the following relief:

1. A declaration that Defendant has violated Plaintiff's right to employment free of discrimination on the basis of gender and free of retaliation for complaining of sexual harassment and an injunction forbidding Defendant from discriminating against Plaintiff and its other women employees on the basis of gender and from retaliating against Plaintiff and its other employees for complaining of discrimination;

2. An order requiring Defendant to reinstate Plaintiff to her position of Training Security Officer;

3. An order requiring Defendant to pay to Plaintiff all back pay, overtime pay, and associated fringe benefits, together with prejudgment interest and front pay;

4. An order requiring Defendant to pay Plaintiff compensatory damages for the emotional and physical pain and suffering she has undergone as a result of the actions of Defendant;

5. An order requiring Defendant to pay Plaintiff her reasonable attorney's fees and costs; and

6. Such other and further relief as this honorable Court may deem just and proper.

Dated: New York, New York
May 26, 2010

Phyllis Gelman (PG 9012)
Gelman & Jones, LLP
305 Madison Avenue, Suite 1060
New York, New York 10165
(212) 557-0559

**Demand for a Jury Trial**

Now comes Plaintiff, by Gelman & Jones, LLP, her attorneys, and demands a trial by jury.

Dated: New York, New York
May 26, 2010

Phyllis Gelman (PG 9012)
Gelman & Jones, LLP
305 Madison Avenue, Suite 1060
New York, New York 10165
(212) 557-0559

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2010.

**Danielle J. Snow**



May 26 10 04:58p Home 901-345-8496 p.1